James W. FITZGERALD

v.

PENTHOUSE INTERNATIONAL, LTD., et al.

Civ. A. No. M–77–1900.

United States District Court, D. Maryland.

Oct. 22, 1981.

William McKamey and George Seymour Morgan, Bethesda, Md., for plaintiff.

William H. Engelman, John Philip Miller, and Kaplan, Heyman, Greenberg, Engelman & Belgrad, Baltimore, Md., Norman Roy Grutman, New York City, for defendants.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The plaintiff, James W. Fitzgerald, brought this action for libel and other torts[1] against Penthouse International, Ltd. (Penthouse), Meredith Corporation, Robert C. Guccione, and Steve Chapple. According to the plaintiff, he was injured by the publication of an article, authored by Chapple, in the June, 1977 issue of Penthouse magazine. The article, entitled "The Pentagon's Deadly Pets," concerns the United States Navy's and the Central Intelligence Agency's alleged training and use of animals for military and intelligence purposes. A portion of the article discusses the military application of dolphin technology, and refers to Fitzgerald's activities in this area.

Fitzgerald filed this lawsuit in November of 1977. After extensive discovery both parties moved for summary judgment.[2] The court heard argument from counsel on July 6, 1979,[3] and by Order dated July 13, 1979, granted summary judgment for the defendants. The court ruled that the article's statements about Fitzgerald were not defamatory or, in the alternative, were true.[4] On appeal, a panel of the Fourth Circuit reversed, holding that genuine issues of material fact existed regarding (1) the article's defamatory meaning, and (2) the truth of some of the article's statements. *Fitzgerald v. Penthouse International, Ltd.*, 639 F.2d 1076, 1078–79 (4th Cir. 1981). The Court of Appeals remanded the case for further proceedings, including a determination by this court of whether Fitzgerald was a private person or a public figure for the purpose of his suit against the media defendants. 639 F.2d at 1079–80.

After this court's receipt of the Fourth Circuit's mandate, Fitzgerald moved for partial summary judgment on the issue of his status in this litigation.[5] The defendants also filed such a motion, along with one on the issues of "actual malice" and punitive damages.[6] Fitzgerald then filed an opposition to the defendant's status motion,[7] as well as a motion to strike the defendants' motion regarding "actual malice" and punitive damages.[8] The plaintiff's latter motion was denied. The court heard argument from counsel on September 11 and October 7, 1981, and the issues raised by the pending motions are now ready for decision.

---

1. Fitzgerald also seeks to recover upon theories of invasion of privacy, trespass, tortious interference with business relations, and conspiracy.

2. Paper Nos. 64 and 65.

3. The transcript of the hearing is docketed as Paper No. 71.

4. Paper No. 68.

5. Paper No. 75.

6. Paper No. 77.

7. Paper No. 80.

8. Paper No. 79.

## I. The Public Figure Doctrine

Prior to 1964, the common law of defamation strongly favored the state's interest in protecting an individual's reputation, and the prevailing view gave little weight to First Amendment considerations.[9] In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), however, the Supreme Court broke with this common law tradition and created a limited constitutional privilege with respect to defamatory statements concerning public officials. The Court held that a defamation plaintiff, who was a public official, could not recover damages absent a showing with "convincing clarity," 376 U.S. at 285–86, 84 S.Ct. at 728–29, that "the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 279–80, 84 S.Ct. at 725–26.[10] *See also Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–76, 15 L.Ed.2d 597 (1966).

Subsequently, in the companion cases of *Curtis Publishing Co. v. Butts*, and *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a divided Court[11] extended *Sullivan's* actual malice requirement to situations involving defamatory statements concerning public figures. *See* 388 U.S. at 164, 87 S.Ct. at 1996 (Warren, C. J., concurring in the result). The actual malice rule enjoyed a brief application to defamatory statements concerning private persons, when the subject matter of the statement concerned issues of general societal interest. Writing for the plurality in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), Justice Brennan stated:

"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."

403 U.S. at 43, 91 S.Ct. at 1819 (footnote omitted).

Three years later, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court rejected the societal interest approach of *Rosenbloom*, finding it to be a constitutionally unacceptable abridgment of the State's interest in protecting a private individual's reputation. 418 U.S. at 346. Focusing on the conduct of the defamation plaintiff, and narrowing the range of privileged defamatory comment to "public controversies," the Court attempted to establish "broad rules of general application" in order to guide the public, the media, and the lower courts. 418 U.S. at 343–44, 94 S.Ct. at 3008–09.[12]

Writing for the majority, Justice Powell identified three classes of public figures:

"Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive

---

**9.** *See* Eaton, The American Law of Defamation Through *Gertz v. Robert Welch, Inc.* and Beyond: An Analytical Primer, 61 *Va.L.Rev.* 1349, 1351–64 (1975). *See also Beauharnais v. Illinois*, 343 U.S. 250, 256–57, 72 S.Ct. 725, 730–31, 96 L.Ed. 919 (1952); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942).

**10.** For good discussions of the *Sullivan* decision, see Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 *Sup.Ct.Rev.* 191; Pedrick, Freedom of the Press and the Law of Libel:

The Modern Revised Translation, 49 *Cornell L.Q.* 581 (1964).

**11.** For commentary on the diverse reasoning of the Justices in these cases, see Kalven, The Reasonable Man and the First Amendment: Hill, Butts, and Walker, 1967 *Sup.Ct.Rev.* 267; The Supreme Court, 1966 Term, 81 *Harv.L.Rev.* 112, 160–66 (1967).

**12.** *See generally Robertson*, Defamation and the First Amendment: In Praise of *Gertz v. Robert Welch, Inc.*, 54 *Texas L.Rev.* 199 (1976).

power and influence that they are deemed public figures for all purposes. *More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.* In either event, they invite attention and comment."

418 U.S. at 345, 94 S.Ct. at 3009 (emphasis supplied).

Two principal reasons were advanced for requiring the so-called limited public figure to demonstrate "actual malice" in order to recover damages in a defamation case. First, "public figures usually enjoy significantly greater access to the channels of effective communication." 418 U.S. at 344, 94 S.Ct. at 3009. At least theoretically, this enables the public figure to expose the falseness of the defamatory statements. 418 U.S. at 344 n.9, 94 S.Ct. at 3009.

More important to the Court, however, was a "compelling normative consideration." 418 U.S. at 344, 94 S.Ct. at 3010. Analogizing to public officials, the Court reasoned that public figures have, by their own conduct, "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." 418 U.S. at 345, 94 S.Ct. at 3010. In other words, "[b]y voluntarily abandoning anonymity in favor of the public spotlight and its attendant heat, public figures have knowingly exposed themselves to a predictable risk of being burned." Eaton, *supra* note 9, at 1420. *Cf.* Ashdown, Gertz and Firestone: A Study in Constitutional Policy-Making, 61 *Minn.L.Rev.* 645, 662–65 (1977) (criticizing the Court's articulated justifications for granting preferential treatment to private persons). In determining whether a defamation plaintiff is a limited-purpose public figure, the trial court is to focus upon "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. at 3013.

Subsequent Supreme Court decisions have, to a degree, clarified the Court's position regarding the proper application of the *Gertz* formulation. *See, e. g., Wolston v. Reader's Digest Association,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). In addition, guidance is available from several recent decisions by the Courts of Appeals. *See, e. g., Jenoff v. Hearst Corp.,* 644 F.2d 1004 (4th Cir. 1981); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).[13]

The defendants contend that Fitzgerald is a public figure only with respect to the issue of the application of dolphin technology to military and intelligence uses. Accordingly, the court's analysis will focus upon the limited-purpose public figure aspect of *Gertz* and its progeny.

An initial consideration is the propriety of determining the plaintiff's status on a motion for summary judgment. In *Rosenblatt v. Baer,* 383 U.S. at 88, 86 S.Ct. at 677, the Court noted that the question of the plaintiff's status in a defamation action, like questions of privilege generally, "is for the trial judge in the first instance to determine." Consequently, if no genuine issue of material fact exists, when the evidence is viewed in the light most favorable to the plaintiff, the court may determine the plaintiff's status on a motion for summary judgment, rather than wait until the close of the evidence. *See, e. g., Rebozo v. Washington Post Co.,* 637 F.2d 375, 379 (5th Cir. 1981); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d at 1293 n. 12.

The court's first inquiry under *Gertz* is whether there existed the requisite public controversy. This requirement would appear to have two principal aspects. First, the topic of the alleged defamation must concern matters of some significance for

---

**13.** For a discussion of Judge Tamm's opinion in *Waldbaum,* see Note, *Waldbaum v. Fairchild Publications, Inc.:* Giving Objectively to the Definition of Public Figures, 30 *Cath.U.L.Rev.* 307, 321–33 (1981).

persons who are not direct participants in the dispute. Second, there must have been some level of awareness of, or participation in, the subject matter of the alleged defamation by persons other than the litigants. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d at 1296–97. *See Avins v. White,* 627 F.2d 637, 647–48 (3d Cir. 1980), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980).

Although it is clear that the *Gertz* public controversy requirement is not satisfied simply when the topic involved is newsworthy, *e. g., Wolston v. Reader's Digest Association,* 443 U.S. at 167–68, 99 S.Ct. at 2707–08; *Time, Inc. v. Firestone,* 424 U.S. at 455–56, 96 S.Ct. at 965–66, the Court has not identified the criteria to be applied in making the public controversy determination. L. Tribe, *American Constitutional Law* 644–45 (1978). *See Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 590 (1st Cir. 1980). As a consequence, with respect to the first aspect of the inquiry, this court is required, notwithstanding *Gertz,* 418 U.S. at 346, 94 S.Ct. at 3010, to define the contours of constitutionally protected defamation by making constitutionally sensitive, content-based decisions about the relative worth of the topic involved.[14] *See* Ashdown, Gertz and Firestone: A Study in Constitutional Policy-Making, 61 *Minn.L.Rev.* at 683–84. *Cf. Time, Inc. v. Firestone,* 424 U.S. at 454, 96 S.Ct. at 965 ("Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz.*")

According to Fitzgerald, there was no public controversy about the military application of dolphin technology either at the time he appeared on "60 Minutes" in 1973, or when Chapple's article was published in 1977. In support of this assertion, Fitzgerald relies on his own affidavits,[15] and the fact that Penthouse has retained only two letters concerning Chapple's article.[16] In

support of their motion, the defendants point to Fitzgerald's own deposition and other evidentiary materials in the record.

■ Fitzgerald would have this court adopt an overly parsimonious view of a "public controversy." With respect to the first aspect of the inquiry, it cannot seriously be doubted that the Government's use of dolphins and other marine animals for military and intelligence operations, such as those conducted during the Viet Nam war, are matters of legitimate, if not vital, public concern. Moreover, all citizens, either on their own or through their elected representatives, have a right to inquire into and comment upon the Government's decision to use weapons and intelligence systems, whose existence has been revealed to the public. *See New York Times Co. v. Sullivan,* 376 U.S. at 269–70, 84 S.Ct. 710, 720, 11 L.Ed.2d 686; *Thornhill v. Alabama,* 310 U.S. 88, 101–02, 60 S.Ct. 736, 743–44, 84 L.Ed. 1093 (1940). *Compare New York Times Co. v. United States,* 403 U.S. 713, 720–24, 91 S.Ct. 2140, 2144–46, 29 L.Ed.2d 822 (1971) (Douglas, J., concurring). It is also apparent that such use of dolphins is, under any standard, a legitimate topic of moral or humanitarian concern.

The second aspect of the public controversy requirement is also satisfied in this case. Contrary to the plaintiff's assertion, an issue need not generate, or be the subject of, a massive publicity campaign in order to constitute a "public controversy." Further, it is equally inappropriate to measure the "public" nature of the controversy simply by the number of persons demonstrated to be interested in its resolution or outcome. Such an approach would be similar to that adopted in *Rosenbloom,* and condemned by the Court in *Gertz* and *Firestone.*

---

**14.** *Accord,* Christie, Injury to Reputation and the Constitution: Confusion Amid Conflicting Approaches, 75 *Mich.L.Rev.* 43, 55–57 (1976); Note, The Editorial Function and the *Gertz* Public Figure Standard, 87 *Yale L.J.* 1723, 1739–41 (1978).

**15.** Fitzgerald Affidavit at ¶ 6, Paper No. 66; Fitzgerald Affidavit at ¶ 3, Paper No. 80; Fitzgerald Affidavit at ¶¶ 192 and 6.

**16.** Paper No. 9.

In any event, the record in this case contains unrebutted evidence demonstrating that "persons were actually discussing some specific question." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1297. *See* Ingber, Defamation: A Contest Between Reason and Decency, 65 *Va.L.Rev.* 785, 836–42 (1979).

As early as 1970, it was reported in the press that the United States Navy had shipped dolphins to Viet Nam for tests involving underwater surveillance.[17] The dolphins' departure from Viet Nam in 1972 was also covered by the national press.[18] In 1973, the military's use of dolphins was the subject of a "60 Minutes" segment, which included the interview with the plaintiff. Also in 1973, a senior member of the Navy's marine mammal group published a nontechnical book on the Navy's work with dolphins and other marine animals. According to the author:

> "Although well over one hundred technical publications have come out of the Navy program in the ten years of its existence, the research findings are not well known outside the relatively small circle of our professional colleagues. *It is the military applications—actual, potential, or simply imagined—that have been widely publicized by the news media, often with the implication that the entire program is cloaked in secrecy. I have not neglected this aspect, either. It is time to clear away some of the misconceptions about what we have been doing."*

F. Wood, *Marine Mammals and Man: The Navy's Porpoises and Sea Lions*, Forward (emphasis supplied) (1973).

In his deposition, Fitzgerald essentially acknowledged the existence of a public controversy concerning the military application of dolphin technology.

"Q. Did you know that there had been articles before the CBS feature in which comments had been made about the use of animals in military application?
A. Yes. I know that.
Q. And did you know that there were some people who approved of it and some people who disapproved?
A. I think so.
Q. And did you know that that was a subject that was discussed among people and appeared in the media?
A. Yes.
Q. And did you agree that it was a subject of some importance to the United States?
A. Yes."[19]

\* \* \* \* \* \*

"Q. In view of what you have read about the countries outside of the United States, would you conclude that the interest in applying dolphin to military technology was a widely held interest?
A. Military technology? It is widely written about in the popular press.
Q. And many people are interested in it?
A. Yes.
Q. And when you say it was written about in the press, military warfare, what were the comments to you as to the utilization of animals to this kind of warfare?
A. Some were favorable, and recently some were unfavorable.
Q. And would you regard this as a subject of public debate?
A. Not particularly.
Q. Well, would you not regard the utilization of dolphins for military purposes of importance to the United States?
A. They have some applications of importance, yes. In my opinion."[20]

Based on the above, the court concludes that the defendants have demonstrated the

---

17. The Washington Post, Dec. 23, 1970, *reprinted at* Paper No. 66, Ex. 2.

18. The Miami Herald, Mar. 25, 1972, *reprinted at* Paper No. 66, Ex. 2.

19. Fitzgerald Deposition at 54–55, Paper No. 65, Ex. H.

20. Fitzgerald Deposition at 110–11, Paper No. 65, Ex. H. *See also* Fitzgerald Deposition at 120–23, Paper No. 65, Ex. H; Fitzgerald Affidavit of July 3, 1979, at ¶ 4, Paper No. 66.

existence of a public controversy sufficient to meet the *Gertz-Firestone* standard.

■ The second inquiry under *Gertz* is whether the plaintiff is a public figure with respect to the identified public controversy. *See Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009. This requirement, as elaborated upon in subsequent cases, appears to have five aspects: (1) whether the plaintiff had access to channels of effective communication; (2) whether the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) whether the plaintiff sought to influence the resolution or outcome of the controversy; (4) whether the controversy existed prior to the publication of the defamatory statements; and (5) whether the plaintiff retained public figure status at the time of the alleged defamation.

In a recent affidavit, Fitzgerald states that no representatives of the media have contacted him about this case, and that he has not been afforded access to the media in order to refute the material attributed to him in the Penthouse article.[21] Assuming the truth of Fitzgerald's assertion that no media representatives have contacted him about this law suit, it does not follow necessarily that he was or is without access to the means of counterargument required by *Gertz.* In any event, uncontested facts in the record establish that Fitzgerald has had since at least 1970, and continues to have, effective means of communicating his views.[22]

Fitzgerald's active research in dolphin technology began in 1964,[23] and he pioneered the military application of dolphin technology for the United States Navy.[24] Fitzgerald has published numerous articles and reports concerning dolphin technology,[25] and has lectured publicly on this subject since 1970.[26] During his term as president of Fitzgerald Laboratories from 1964 to 1972,[27] he distributed three separate brochures on dolphin technology, one of which was written in Spanish.[28] Moreover, all of the brochures refer to the military and security applications of dolphin technology. The Spanish language brochure was distributed by Fitzgerald to persons and entities outside of the United States in order to solicit business for Fitzgerald Laboratories.[29] Fitzgerald's potential market included government agencies in Mexico, Guatemala, Nicaragua and Honduras.[30] Fitzgerald personally visited Mexico to promote the establishment of a dolphin program with an agency of the Mexican government.[31] Two of the brochures, one in English and one in Spanish, specifically refer to the use of dolphins in anti-submarine warfare.[32]

Sometime in late 1972 or early 1973, Fitzgerald was invited to participate in the taping of a "60 Minutes" segment. This was done at Fitzgerald Laboratories in Annapolis, Maryland, and the segment was aired in February of 1973. The topic of the

---

21. Fitzgerald Affidavit of May 7, 1981, at ¶¶ 7 and 8, Paper No. 75.

22. The factors indicating access to channels of communication do not necessarily indicate that the plaintiff voluntarily assumed a role of public prominence. *E. g., Hutchinson v. Proxmire*, 443 U.S. at 134–35, 99 S.Ct. at 2687–89; *Time, Inc. v. Firestone*, 424 U.S. at 454–55 n. 3, 96 S.Ct. at 965–66 n.3.

23. Fitzgerald Deposition at 30–31, Paper No. 65, Ex. H.

24. Interrogatory Answer No. 31, Paper No. 16.

25. Interrogatory Answer No. 26, Paper No. 16.

26. Interrogatory Answer Nos. 27 and 36, Paper No. 16; Fitzgerald Deposition at 25–26, Paper No. 65, Ex. H.

27. Interrogatory Answer Nos. 11 and 17, Paper No. 16.

28. Paper No. 65, Ex. I; Fitzgerald Deposition at 99, Paper No. 65, Ex. H.

29. Fitzgerald Deposition at 97–98, 101–03, Paper No. 65, Ex. H.

30. *Id.* at 104–05.

31. *Id.* at 106. *See* Interrogatory Answer No. 31, Paper No. 32.

32. Fitzgerald Deposition at 101–02, Paper No. 65, Ex. H.

segment, moderated by Morley Safer, was the military application of dolphin and marine mammal technology.[33] In March of 1976, Fitzgerald was contacted by Newsday reporter Robert Kessler. Kessler informed Fitzgerald that he was writing an extensive investigative piece on the Navy's and Central Intelligence Agency's involvement in dolphin technology and wanted Fitzgerald's comments.[34] According to Fitzgerald, his answers to Kessler's questions were "mostly non-committals." The Kessler article was published in Newsday on April 10, 1976. *See* Kessler, *Navy Uses Dolphins for Spying, Disgruntled Scientist Testifies*, Newsday, Apr. 10, 1976.

Based on the above undisputed facts, the court concludes that Fitzgerald had "significantly greater access to the channels of effective communication ... than private individuals normally enjoy." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 344, 94 S.Ct. at 3009 (footnote omitted). Most private citizens are not solicited by a major television network to give their views on issues of public concern. Further, most private citizens are not similarly contacted by the print media. Through Fitzgerald Laboratories, and subsequently through his personal business efforts, Fitzgerald has had available to him a significant number of public forums for the expression of his views of the issue of dolphin technology. That Fitzgerald may have chosen not actively to engage the public media subsequent to his appearance to "60 Minutes" does not negate the existence of, or his access to, channels of effective communication. *See Hutchinson v. Proxmire*, 443 U.S. at 136, 99 S.Ct. at 2689. *Compare Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d at 589–90 *with Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 (3d Cir. 1980).

The next two aspects of the *Gertz* inquiry may be considered together. That is, whether Fitzgerald *voluntarily* engaged the public's attention prior to the alleged defa-

mation, in a significant way, in order to influence the outcome of a particular controversy. The focal point in this inquiry is, of course, Fitzgerald's 1973 appearance on "60 Minutes."

Fitzgerald contends that although he knowingly appeared on the national television program, and discussed the military application of dolphin technology with Morley Safer, he did not thereby intend to become a public figure or to influence the outcome of any public controversy. According to the plaintiff, the reason for his appearance on the program was to promote his new product line of non-military dolphin technologies.[35] It was the network that decided to edit out his remarks on the peaceful aspects of dolphin technology and use only his comments on the dolphin's military capabilities.[36]

Whether a person has voluntarily injected himself into a public controversy, in order to have an impact on its outcome, cannot be determined solely by reference to the subjective motivations of the actor. Certainly, however, a subjective or volitional element must be considered. For example, a private person cannot be transformed into a public figure simply because his conduct attracts some media attention. *See Wolston v. Reader's Digest Association*, 443 U.S. at 166–168, 99 S.Ct. at 2706–08; *Time, Inc. v. Firestone*, 424 U.S. at 454. Further, an individual does not become a public figure when the media spotlight begins to focus on his person because of the publication of the defamatory material. *See Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2689; *Jenoff v. Hearst Corp.*, 644 F.2d at 1007.

On the other hand, if an individual has knowingly engaged in the sort of conduct that is bound to draw the public's attention and comment, he cannot avoid public figure status simply by asserting

---

**33.** Paper No. 65, Ex. E.

**34.** Fitzgerald Affidavit of July 3, 1979, at ¶ 7, Paper No. 66.

**35.** Fitzgerald Affidavit of July 3, 1979, at ¶ 5, Paper No. 66.

**36.** Fitzgerald Affidavit of May 7, 1981, at ¶¶ 3–6, Paper No. 75.

that he did not intend to become one. *See Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 (5th Cir. 1978). Once the initial volitional threshold is crossed, the court "must look at the facts, taken as a whole, through the eyes of a reasonable person." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1293. *Accord, McManus v. Doubleday & Co., Inc.*, 513 F.Supp. 1383, 1385–86 (S.D.N.Y.1981) (Weinfeld, J.). *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009 ("the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk.")

It is undisputed in this case that Fitzgerald voluntarily appeared on "60 Minutes" and discussed the military applications of dolphin technology.[37] He was introduced to the viewing public by Morley Safer as "James Fitzgerald, President of Fitzgerald Laboratories ... one of the pioneers in dolphin research for the U.S. intelligence community and the Navy."[38] Among other things, Fitzgerald commented on the Navy's use of dolphins in Viet Nam, stated that several of those dolphins were "Fitzgerald dolphins," and noted his own work on dolphin anti-swimmer systems.[39] Although he was aware of how he was portrayed on the program, Fitzgerald never informed CBS that he was in any way dissatisfied with the presentation.[40]

Consequently, in light of his appearance on "60 Minutes," "a reasonable person would have concluded that [Fitzgerald] would play or was seeking to play a major role in the outcome of the [dolphin] controversy." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1298. *See Jenoff v. Hearst Corp.*, 644 F.2d at 1007–08. Moreover, in light of Fitzgerald's dolphin related work both prior to and after the 1973 "60 Minutes" program, it cannot be said that Fitzgerald's role in the military application of dolphin technology was without "special prominence." *See Gertz v. Robert Welch, Inc.*, 418 U.S. at 351, 94 S.Ct. at 3012.

Since Fitzgerald attained public figure status in 1973, prior to the publication of the defamation at issue, *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2689, the only issue remaining for resolution is whether he retained that status when the Penthouse article was published in 1977.

The Supreme Court has expressly reserved the question of "whether or when an individual who once was a public figure may lose that status by the passage of time." *Wolston v. Reader's Digest Association*, 443 U.S. at 166 n. 7, 99 S.Ct. at 2707 n. 7. Concurring in the result in *Wolston*, Justice Blackmun, joined by Justice Marshall, indicated that they would hold that the passage of time can erase public figure status. 443 U.S. at 169–72, 99 S.Ct. at 2709. Relevant factors to be considered would include the extent to which the defamed party retains "access to the means of counterargument," and whether he has made "conscious efforts to regain anonymity." 443 U.S. at 170–71, 99 S.Ct. at 2709–2710. *But cf.* 443 U.S. at 172, 99 S.Ct. at 2710 (Brennan, J., dissenting) ("The mere lapse of time is not decisive.")

In *Street v. National Broadcasting Co.*, 645 F.2d 1227, 1235 (6th Cir.), *cert. granted*, —— U.S. ——, 102 S.Ct. 91, 70 L.Ed.2d 83 (1981) a panel of the Sixth Circuit held that "once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of *that controversy*." (emphasis in original). *But see* 645 F.2d at 1246–49 (Peck, J., dissenting).

This court need not determine the precise contours of the "passage of time" question in order to resolve that issue in this case. It is undisputed that Fitzgerald had an opportunity in April of 1976, prior to the alleged defamation, to have his views on the military application of dolphin technolo-

---

**37.** Fitzgerald Deposition at 9–19, 125–29, Paper No. 65, Ex. H.

**38.** Paper No. 65, Ex. E at 3.

**39.** *Id.* at 4.

**40.** Fitzgerald Deposition at 12, Paper 65, Ex. H.

gy considered for publication in Newsday. The Chapple article containing the allegedly defamatory material appeared in the June 1977 issue of Penthouse Magazine. Consequently, by his own admission, Fitzgerald had available to him "access to the means of counterargument" within approximately one year of the Chapple article's publication.

In support of their contentions regarding the existence of a public controversy and Fitzgerald's participation in that controversy, the defendants submitted the following article that appeared in the September 10, 1978, issue of Parade Magazine.

> "Some of the most valuable members the U.S. Navy are dolphins trained to defend American naval bases.
>
> During the Vietnam war, squads of killer dolphins pulled guard duty at our billion-dollar Cam Ranh Bay base, now reputedly controlled by the Soviets. According to James Fitzgerald, former chief of the CIA's Office of Dolphin Research: 'With their built-in sonar, the dolphins detected enemy demolition divers on sabotage missions. They impaled them with long hypodermic needles connected to carbon dioxide cartridges. The frogmen just blew up.'
>
> One of these days the Navy is going to release the account of how 'some 60 North Vietnamese frogmen were nullified.'"

Parade Magazine, *Our Unsung Heroes*, Sept. 10, 1978, at p. 8.[41]

Fitzgerald has denied, under oath, that he was the source of the material attributed to him in the Parade article.[42] Consequently, the Parade article cannot be considered by the court in determining whether the plaintiff retained public figure status after 1973.[43] Nevertheless, the Parade article does indicate that there continued to be a public controversy, regarding the military application of dolphin technology, as late as the fall of 1978. *See Rosenblatt v. Baer*, 383 U.S. at 87 n. 14, 86 S.Ct. at 676 n.14; *Gray v. Udevitz*, 656 F.2d 588, 590–91 n. 3 (10th Cir. 1981).

■ Although no evidence is before the court conclusively indicating that Fitzgerald actively sought public attention subsequent to his February 1973, appearance on "60 Minutes," it does not follow necessarily that his limited public figure status was eroded in June of 1977. As will be discussed in Part II *infra*, the quotations attributed to Fitzgerald in the Penthouse article were derived from the transcript of the 1973 "60 Minutes" segment. Having aired his views on a nationally televised program in 1973, Fitzgerald cannot unilaterally "withdraw" his comments on a public controversy from the public domain, and claim private individual status regarding an article using those comments that is published some four years later. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3010 ("the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk.") *See also Time, Inc. v. Johnston*, 448

---

**41.** *Reprinted at* Paper No. 85, Ex. 2. Although the defendants have provided the court only a photocopy of the Parade article, the court will take judicial notice of the article's publication in the September 10, 1978 edition of Parade Magazine, and that such magazine was distributed nationally. Rule 201(b)(2), Fed.R.Evid. *See, e. g., United States v. Holmes*, 414 F.Supp. 831, 834 n. 3 (D.Md.1976); *Fox v. Kane-Miller Corp.*, 398 F.Supp. 609, 651–52 n. 40 (D.Md. 1975), *aff'd*, 542 F.2d 915 (4th Cir. 1976); *Baumel v. Rosen*, 283 F.Supp. 128, 144 n. 8 (D.Md. 1968), *aff'd in part, rev'd in part on other grounds*, 412 F.2d 571 (4th Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 688, 24 L.Ed.2d 681 (1970). *See generally* 1 *Weinstein's Evidence* ¶ 201[03] (1980).

**42.** Fitzgerald Affidavit of October 13, 1981, at ¶¶ 4(e) and 5, Paper No. 86. Although Fitzgerald states in this affidavit that the Parade article was "planted" by the defendants, such a claim is neither based on personal knowledge nor supported by admissible evidence. Rule 56(e), Fed.R.Civ.P. Accordingly the court will disregard this allegation.

**43.** Since the Parade article appeared subsequent to the Penthouse article it is, of course, irrelevant to the issue of the plaintiff's status at the time of the alleged defamation. *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2689.

F.2d 378, 381–82 (4th Cir. 1971). Thus, while it is not altogether clear what factors, if any, will operate to remove a limited public figure from that status, the court holds that the passage of time had not eroded Fitzgerald's limited public figure status, on the issue of the military application of dolphin technology, at the time of the publication of the Penthouse article.

## II. Actual Malice

As an initial matter, the court will explain its denial of Fitzgerald's motion to strike the defendants' motion for summary judgment on the issues of actual malice and punitive damages.[44] According to Fitzgerald, such a motion should have been stricken as untimely under the latest scheduling order entered in the case, and as beyond the scope of the Fourth Circuit's remand order in *Fitzgerald v. Penthouse International, Ltd.*, 639 F.2d 1076 (4th Cir. 1981). These contentions are without merit.

In their original summary judgment motion,[45] the defendants specifically addressed the issues of actual malice and punitive damages. Since that motion was filed within the time period set by the scheduling order, their renewal of those grounds on remand is proper. In addition, the Fourth Circuit's opinion in *Fitzgerald* does not purport to preclude consideration of these issues prior to trial. That court held only that it was inappropriate to grant summary judgment on the issues of defamatory meaning and the truth of the article's statements.

Before addressing the substance of the parties' contentions regarding actual malice, it is necessary to consider the propriety of ruling on the malice question on a motion for summary judgment. Prior to 1979, several courts were apparently of the view that summary judgment on the malice question was "especially appropriate" in First Amendment cases due to the chilling effect of a protracted trial. *See, e. g.,*

*Anderson v. Stanco Sports Library, Inc.*, 542 F.2d 638, 641 (4th Cir. 1976); *Washington Post Co. v. Keogh*, 365 F.2d 965, 967–68 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). In both *Hutchinson v. Proxmire*, 443 U.S. at 120 n. 9, 99 S.Ct. at 2680 n. 9, and *Wolston v. Reader's Digest Association*, 443 U.S. at 161 n.3, 99 S.Ct. at 2704 n.3, however, the Court cast considerable doubt on the notion that the chilling effect of a protracted trial justified any "presumption" in favor of summary judgment on the actual malice question.[46]

■ In light of the Court's comments, the Second Circuit has approved the use of summary judgment, combining the usual Rule 56 standards with the higher degree of proof required in defamation cases. Accepting the plaintiff's version of disputed facts, summary judgment is appropriate when "no reasonable jury could find with convincing clarity that [the defendants] acted with actual malice" in the constitutional sense. *Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932, 940 (2d Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). *See Rebozo v. Washington Post Co.*, 637 F.2d at 380–82 (articulating same standard but finding disputed issues of fact regarding defendant's awareness of falsity). Although the Fourth Circuit has not expressly considered the issue in light of *Wolston* and *Hutchinson*, that court did note, without criticism, Judge Harvey's grant of summary judgment on the malice question in *Jenoff v. Hearst Corp.*, 453 F.Supp. 541, 548–50 (D.Md.1978), *aff'd*, 644 F.2d at 1005 n. 3. In the absence of further guidance from the Fourth Circuit, this court will adopt the formulation articulated by Judge Oakes in *Yiamouyiannis.*

■ It is well settled that a public figure must show actual malice in order to recover actual damages in a defamation case. *See, e. g., Gertz v. Robert Welch,*

---

**44.** Paper No. 79.

**45.** Paper No. 65.

**46.** *See* Note, Public Figure Defamation: Preserving Summary Judgment to Protect Free Expression, 49 *Fordham L.Rev.* 112 (1980).

*Inc.*, 418 U.S. at 334–37, 94 S.Ct. at 3004–05; *Ryan v. Brooks*, 634 F.2d 726, 730–32 (4th Cir. 1980). It is equally settled that any defamation plaintiff must prove actual malice in order to recover presumed or punitive damages. *See, e. g., Gertz v. Robert Welch, Inc.*, 418 U.S. at 348–50, 94 S.Ct. at 3011–12; *Yerkie v. Post-Newsweek Stations*, 470 F.Supp. 91, 93 (D.Md.1979).

 In general terms, a defendant can be said to have acted with actual malice, in the constitutional sense, when: (1) a statement is made with actual knowledge of its falsity, *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26; or (2) there is a high degree of awareness of the statement's probable falsity, *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); or (3) a statement is made with reckless disregard of its truth or falsity, *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. In addition, actual malice must be shown by "clear and convincing" evidence. *See, e. g., Gertz v. Robert Welch, Inc.*, 418 U.S. at 342, 94 S.Ct. at 3008; *New York Times Co. v. Sullivan*, 376 U.S. at 285–86, 84 S.Ct. at 728–29. *See generally* Eaton, *supra* note 9, at 137–75.

In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court reiterated the high degree of proof necessary to establish recklessness in the *Sullivan* sense. After reviewing the Court's precedents on the issue, Justice White stated:

> "These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

390 U.S. at 731, 88 S.Ct. at 1325 (emphasis supplied).

Recently, in *Ryan v. Brooks*, 634 F.2d 726 (4th Cir. 1980), Judge Phillips undertook an exhaustive analysis of the meaning of the phrase "actual malice." Judge Phillips noted the continued validity of the *St. Amant* formulation, and concluded:

> "As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error. *See Dickey v. CBS Inc.*, 583 F.2d 1221, 1227 (3d Cir. 1978); *Hotchner v. Castillo-Puche*, 551 F.2d 910, 912–14 (2d Cir. 1977); *Grzelak v. Calumet Publishing Co.*, 543 F.2d 579, 583 (7th Cir. 1975); *Vandenburg v. Newsweek*, 507 F.2d at 1026–28; *Drotzmann's, Inc. v. McGraw-Hill, Inc.*, 500 F.2d 830, 834 (8th Cir. 1974). In two cases in which the evidence of malice was found to be sufficient, by contrast, the facts indicated strongly that the challenged allegations had been completely fabricated by the writer. *See Carson v. Allied News Co.*, 529 F.2d 206, 213 (7th Cir. 1976); *Davis v. Schuchat*, 510 F.2d 731, 735–36 (D.C.Cir.1975).

634 F.2d at 734. *See also Jenoff v. Hearst Corp.*, 453 F.Supp. at 548–50.

The court's task of assessing the existence of actual malice in this case has been made somewhat easier because it is undisputed that the evidence relating to that issue has been fully developed, and the plaintiff has not requested further discovery into the defendants' "state of mind."[47] *See Yiamouyiannis v. Consumer's Union of the United States, Inc.*, 619 F.2d at 940; *Velle Transcendental Research Association, Inc. v. Sanders*, 518 F.Supp. 512, 518 (C.D.Cal.1981). *Cf. Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (permitting discovery into state of mind of a media defendant). *See also Hutchinson v. Proxmire*, 443 U.S. at 120 n. 9, 99 S.Ct. at 2680 n. 9 (noting potential

**47.** The plaintiff has deposed all of the relevant actors in this case and admitted as much, through counsel, at the hearing in this case on September 11, 1981.

state of mind problem when determining actual malice question on summary judgment).

Fitzgerald contends that actual malice is present in this case due to the following: (1) neither the author nor the editors attempted to verify with Fitzgerald the accuracy of the informant's statements concerning him; (2) no verification was attempted through any government agency; (3) neither the author nor the editors required the informant to produce documents verifying independently the accuracy of the information; (4) the editors and the author failed to inquire fully into the informant's background; (5) the editors failed to train and supervise adequately the researcher assigned to the article; (6) the author used some of his own words to characterize Fitzgerald's conduct; and (7) the fact that changes were made in the informant's curriculum vitae should have put the defendants on notice that the informant's information may have been inaccurate. The following undisputed facts, revealed during the extensive discovery that occurred in this case, make it plain that the above contentions are without merit.

Prior to submitting the dolphin article to Penthouse, Chapple had written numerous articles that had appeared in major publications.[48] In researching the dolphin article, Chapple reviewed the transcript of the 1973 "60 Minutes" segment in which Fitzgerald was interviewed by Morley Safer. That transcript was the source of the quotations attributed to Fitzgerald in the Penthouse article.[49] Chapple also worked with, and provided information to, Susan Bidel. Bidel was the research editor assigned to the article.[50]

One of Chapple's sources for the article was Michael Greenwood, who had previously submitted an unsolicited report on the military's dolphin program to the Senate Select Intelligence Committee.[51] Greenwood supplied Chapple with a copy of the report, and they discussed Greenwood's information both in person and on the telephone.[52] Chapple also checked with Robert Kessler, the Newsday reporter who, in 1976, had published an article on Greenwood's report.[53] Chapple never contacted Fitzgerald because Greenwood had told him that Fitzgerald was dead.[54] According to Chapple, at no time did he have reason to question Greenwood's credibility.[55] Chapple's characterization of Fitzgerald's conduct as attempting to make some "fast bucks" was his own interpretation of Fitzgerald's business conduct.[56]

Bidel was assigned to research the Chapple article by Peter J. Bloch, a Penthouse senior editor.[57] Although Bidel was given no special instructions, she had been instructed previously regarding her verification duties.[58] Bidel contacted both Chapple and Greenwood to verify the statements contained in Chapple's article.[59] Greenwood orally confirmed to Bidel the statements pertaining to Fitzgerald,[60] and Bidel tape-recorded this conversation.[61] Their

48. Chapple Deposition at 98, Paper No. 65, Ex. J. At the time of his deposition, Chapple was under contract with Doubleday. Chapple Deposition at 127.

49. Chapple Deposition, *supra* note 48, at 45–47, 52–54, 57, 76–79, 94.

50. Chapple Deposition, *supra* note 48, at 80–81, 100.

51. The report is docketed at Exhibit F, Paper No. 65.

52. Chapple Deposition, *supra* note 48, at 22, 58, 61–65.

53. Chapple Deposition, *supra* note 48, at 68.

54. Chapple Deposition, *supra* note 48, at 65, 86.

55. Chapple Deposition, *supra* note 48, at 65–66, 76–77.

56. Chapple Deposition, *supra* note 48, at 58–59.

57. Bidel Deposition at 7, Paper No. 65, Ex. N; Bloch Depositions at 6, Paper No. 65, Ex. M.

58. Bloch Deposition, *supra* note 57, at 15–16.

59. Bidel Deposition, *supra* note 57, at 21–24.

60. Bidel Deposition, *supra* note 57, at 25–26.

61. A copy of the transcript is docketed as Exhibit Q, Paper No. 65.

conversation was consistent with what Greenwood had reported to Chappel in a letter dated December 30, 1976, in which Greenwood critiqued a draft of the article.[62] The information in Greenwood's letter was also consistent with that contained in his so-called Senate Report.

Bidel also obtained a copy of the 1973 "60 Minutes" segment.[63] She relied on this transcript, as well as her discussions with Greenwood, in verifying the references to Fitzgerald in Chapple's article.[64] Although Chapple told Bidel that Fitzgerald was dead,[65] a view shared by Greenwood,[66] Bidel attempted, albeit unsuccessfully, to locate Fitzgerald.[67]

Greenwood testified at his deposition that he verified to Bidel the article's references to Fitzgerald during a telephone conversation.[68] In particular, Greenwood confirmed to Bidel that Fitzgerald had contacted foreign governments regarding the sale of classified dolphin systems;[69] that Fitzgerald had distributed brochures to foreign governments[70] containing information about the military application of dolphin technology;[71] that the Navy was aware of Fitzgerald's activities regarding foreign governments but did not make the issue public in order to maintain secrecy;[72] and that Fitzgerald had personally told Greenwood about the cocktail party incident involving Fitzgerald and an admiral.[73] Greenwood also stated that all of the information he provided to Chapple was true.[74]

The above evidence produced by the defendants, which remains uncontroverted by the plaintiff, establishes beyond doubt that the defendants neither knowingly published falsehoods, nor published the Chapple article with "the high degree of awareness of [its] probable falsity demanded by *New York Times*." *Garrison v. Louisiana*, 379 U.S. at 74, 85 S.Ct. at 215. *See Otepka v. New York Times Co.*, 379 F.Supp. 541, 544–45 (D.Md.1973). Further, Chapple's somewhat liberal use of language in characterizing Fitzgerald's business activities does not create a jury question on the issue of actual malice. *See Time, Inc. v. Pape*, 401 U.S. 279, 290–92, 91 S.Ct. 633, 639–40, 28 L.Ed.2d 45 (1971); *Ryan v. Brooks*, 634 F.2d at 733.

In his reply to the defendants' motion on the malice issue,[75] Fitzgerald contends that there is a jury question because of several statements made by Greenwood in his letter to Chapple of December 30, 1976. According to Fitzgerald, these statements were such as to constitute "obvious reasons" for the defendants to question Greenwood's credibility.

Fitzgerald's theory of actual malice, regarding the statements in Greenwood's letter, is founded upon Justice White's comment in *St. Amant* that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326 (footnote omitted). As an

---

**62.** A copy of the letter is docketed as Exhibit P, Paper No. 65.

**63.** Bidel Deposition, *supra* note 57, at 29.

**64.** Bidel Deposition, *supra* note 57, at 36–45, 47, 64–67.

**65.** Bidel Deposition, *supra* note 57, at 46.

**66.** Greenwood Deposition at 61–64, Paper No. 65, Ex. O.

**67.** Bidel Deposition, *supra* note 57, at 27–29.

**68.** Greenwood Deposition, *supra* note 66, at 22, 63.

**69.** Greenwood Deposition, *supra* note 66, at 36–37, 127–131, 134.

**70.** Greenwood Deposition, *supra* note 66, 38–40, 90–91, 94–95.

**71.** Greenwood Deposition, *supra* note 66, 98–100, 103–06.

**72.** Greenwood Deposition, *supra* note 66, at 42–43.

**73.** Greenwood Deposition, *supra* note 66, at 152–153.

**74.** Greenwood Deposition, *supra* note 66, at 60–61.

**75.** Paper No. 84.

example of what constitutes "obvious reasons to doubt," Justice White cited the concurring opinion of Chief Justice Warren in *Curtis Publishing Co. v. Butts*, 388 U.S. at 169–70, 87 S.Ct. at 1998–99 (Warren, C. J., concurring in the result), and the dissenting opinion of Justice Brennan, 388 U.S. at 172, 87 S.Ct. at 2000 (Brennan, J., dissenting), which Justice White joined. 390 U.S. at 732 n. 3, 88 S.Ct. at 1326 n. 3.

In *Butts*, Chief Justice Warren identified the following facts as constituting "obvious reasons to doubt."

"Suffice it to say that little investigative effort was expended initially, and *no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue.*"

388 U.S. at 169–70, 87 S.Ct. at 1998–99 (Warren, C. J. concurring in the result) (emphasis supplied).

As noted by Judge Phillips in *Ryan v. Brooks*, 634 F.2d at 733, "[a]side from the *Butts* case, there is only one instance in which the Supreme Court has upheld a finding of liability under the *New York Times* standard." (footnote omitted). In that case, *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), the plaintiffs brought a "false light" suit against a newspaper publisher and the reporter who authored the allegedly tortious article.[76] The circumstances identified by Justice Stewart as constituting actual malice were as follows:

"It is conceded that the story contained a number of inaccuracies and false statements. Most conspicuously, although Mrs. Cantrell was not present at any time during the reporter's visit to her home, Eszterhas wrote, 'Margaret Cantrell will talk neither about what happened nor about how they are doing. She wears the same mask of non-expression she wore at the funeral. She is a proud woman. Her world has changed. She says that after it happened, the people in town offered to help them out with money and they refused to take it.' Other significant misrepresentations were contained in details of Eszterhas' descriptions of the poverty in which the Cantrells were living and the dirty and dilapidated conditions of the Cantrell home."

419 U.S. at 248, 95 S.Ct. at 468 (footnote omitted).

Thus, since the reporter who authored the article based its content on his personal visit to the family's home, during which Mrs. Cantrell was not present, it was obvious to him that the article's purported quotations of Mrs. Cantrell were false. 419 U.S. at 253, 95 S.Ct. at 470.

Similarly, in cases such as *Carson v. Allied News Co.*, 529 F.2d 206, 212–13 (7th Cir. 1976), and *Davis v. Schuchat*, 510 F.2d 731, 735–36 (D.C.Cir.1975), evidence of actual malice was held to exist when the allegedly libelous material was primarily the product of the author's imagination, and the author could not identify the sources of his information.

In contrast to the circumstances presented in the above cases, it is beyond dispute that the defendants were not informed of the alleged falsity of the article's information prior to publication, and that Chapple's account of Fitzgerald's business activities was not a product of his imagination. Moreover, the defendants undertook fairly extensive efforts to verify all of Chapple's sources of information. Finally, contrary to Fitzgerald's assertion, Greenwood's statements in his 1976 letter to Chapple, either singly or in combination with the other evidence of record, did not give the defendants "obvious reasons" to doubt Greenwood's credibility or the accuracy of his information concerning Fitzgerald.

As an initial matter, it should be noted that the majority of the statements highlighted by Fitzgerald in his opposition are taken out of context. These statements concern for the most part either Green-

---

**76.** The Court agreed with the Sixth Circuit's ruling that there was insufficient evidence of actual malice to support the jury's verdict as to the photographer. 419 U.S. at 253 n. 5, 95 S.Ct. at 470 n. 5.

wood's interpretation of irrelevant historical incidents, or suggest hardships common among "whistleblowers." [77] Finally, and most importantly, the statements simply do not suggest that Greenwood was lacking in credibility, or that his account of Fitzgerald's activities was false. *See Ryan v. Brooks*, 634 F.2d at 734; *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 92–93 & n. 12 (S.D.N.Y.1980).

Since the plaintiff has not produced evidence sufficient to suggest even an inference of malice in the constitutional sense under any recognized theory, and the defendants have produced substantial and undisputed evidence to the contrary, the court holds that "no reasonable jury could find with convincing clarity that [the defendants] acted with actual malice." *Yiamouyiannis v. Consumer's Union of the United States*, 619 F.2d at 940. Accordingly, the defendants' motions on the issues of actual malice and punitive damages will be granted.

### III. The Plaintiff's Other Tort Claims

Along with defamation, the plaintiff has alleged four other types of torts. The factual basis underlying all of these additional tort claims is the publication of the Chapple article in the June 1977, issue of Penthouse Magazine. It must be decided, therefore, whether Fitzgerald's non-defamation tort claims are affected by the court's rulings on Fitzgerald's status and actual malice.

### A. Invasion of Privacy

Count II of Fitzgerald's complaint is labeled "invasion of privacy." The plaintiff has not, however, specified the branch of the privacy doctrine relied on in support of this claim.

In *Carr v. Watkins*, 227 Md. 578, 586–87, 177 A.2d 841 (1962), the Court of Appeals of Maryland gave formal recognition to the general area of tort law known as the right of privacy.[78] Subsequently, in *Household Finance Corp. v. Bridge*, 252 Md. 531, 536–38, 250 A.2d 878 (1969), the Court of Appeals adopted the four branches of the privacy doctrine recognized by Professor Prosser and incorporated into section 652A of the *Restatement (Second) of Torts* (Tent. Draft No. 13, Apr. 27, 1967). The privacy sections of the *Restatement (Second) of Torts* were adopted finally by the American Law Institute on May 19, 1976, and it appears that the Court of Appeals will follow the final revision. *See, e. g., Hollander v. Lubow*, 277 Md. 47, 53–55, 351 A.2d 421 (1976) (Tent. Draft No. 21, April 5, 1976). *See also Beane v. McMullen*, 265 Md. 585, 599–600, 291 A.2d 37 (1972) (Tent. Draft No. 13); *Harnish v. Herald-Mail Co., Inc.*, 264 Md. 326, 336–37, 286 A.2d 146 (1972) (Tent. Draft No. 13).

According to section 652A of the *Restatement (Second) of Torts* (1977), the following four types of privacy invasions are, at least theoretically, actionable.

"(2) The right of privacy is invaded by—

(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or

(b) appropriation of the other's name or likeness as stated in § 652C; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E."

The first two branches of the right of privacy clearly have no application to this case.[79] The third branch, the disclosure of

---

**77.** The substance of the statements in Greenwood's letter, relied on by Fitzgerald, also appears in the transcript of Bidel's telephone conversation with Greenwood. Paper No. 65, Ex. Q. The court carefully reviewed this transcript and could find nothing therein that would even suggest that the defendants had "obvious reasons" to doubt Greenwood's credibility. Moreover, the transcript makes it appear that both Bidel and Greenwood were intent upon pre-

cluding even minor inaccuracies in the final version of the article.

**78.** The Court of Appeals cited, among other authorities, Prosser, Privacy, 48 *Calif.L.Rev.* 383 (1960); Warren & Brandeis, The Right to Privacy, 4 *Harv.L.Rev.* 193 (1890).

**79.** There is no First Amendment privilege with respect to the appropriation of another's name

**602**

private facts, is inapplicable to this case for two reasons. First, the majority of the information concerning Fitzgerald that appeared in the Chapple article was not private. Fitzgerald had discussed the military applications of dolphin technology on national television, and had distributed brochures and lectured publicly on that technology. Second, the information contained in the Chapple article was a matter of public interest. *See, e. g., Bilney v. Evening Star Newspaper Co.,* 43 Md.App. 560, 571–73, 406 A.2d 652, *cert. denied,* 286 Md. 743 (1979); *Restatement (Second) of Torts* § 652D, comments b, d, e & h (1977). *See generally Hollander v. Lubow,* 277 Md. at 57–60, 351 A.2d 421. *See also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 489–95, 95 S.Ct. 1029, 1043–46, 43 L.Ed.2d 328 (1975).

It would appear, however, that Fitzgerald has stated a cognizable claim under the "false light" branch of the right of privacy. Section 652E of the *Restatement (Second) of Torts* (1977), provides:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Caveat:

The Institute takes no position on whether there are any circumstances under which recovery can be obtained under this Section if the actor did not know of or act with reckless disregard as to the falsity of the matter publicized and the false light in which the other would be placed but was negligent in regard to these matters."

or likeness for commercial purposes. *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S.

Fitzgerald alleges in Count II that the statements concerning him in Chapple's article were false, and that the article portrayed him in a highly offensive manner. *Restatement (Second) of Torts* § 652E, comments a & c (1977).

Section 652E of the *Restatement (Second) of Torts* (1977) has never been construed by the Court of Appeals of Maryland. As a consequence, this court does not know, and can find no basis upon which to predict, whether the Court of Appeals would construe section 652E(b) as requiring actual malice in the *Sullivan* sense. *See Restatement (Second) of Torts* § 652E, comment d (1977). It is necessary, therefore, to reach the constitutional question.

In *Time, Inc. v. Hill,* 385 U.S. 374, 380–91, 87 S.Ct. 534, 538–43, 17 L.Ed.2d 456 (1967), the Supreme Court held the *Sullivan* actual malice standard applicable to a "false light" suit by private individuals when the subject of the article involved matters of public interest. It is uncertain, however, whether *Hill's* "matters of public interest" rationale survives *Gertz's* rejection of the "public issue" test of *Rosenbloom,* at least when the plaintiff is a private individual. *See* J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 787 (1978). Although the Court noted this issue in *Cantrell v. Forest City Publishing Co.,* 419 U.S. at 250–51, 95 S.Ct. at 469, that case did not require its resolution since the Court found sufficient evidence of actual malice to support the jury's award of actual damages. 419 U.S. at 252–53, 95 S.Ct. at 470. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. at 490 n.19, 95 S.Ct. at 1044 n.19; *Id.* at 498 n.2, 95 S.Ct. at 1048 n.2; (Powell, J., concurring); *Ryan v. Brooks,* 634 F.2d at 733–34 n.8.

Although if presented with such a case this court might be inclined to hold, as a matter of constitutional law, that private individuals need show only negligence in a "false light" suit, *see Dresbach v. Doubleday & Co., Inc.,* 518 F.Supp. 1285, 1288 (D.D.C.1981), the court need not reach that

562, 571–79, 97 S.Ct. 2849, 2855–59, 53 L.Ed.2d 965 (1977).

issue because it has already determined that Fitzgerald is a limited public figure. Given the close theoretical relationship between a claim for defamation and a "false light" suit for invasion of privacy, *see Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. at 573, 97 S.Ct. at 2856; *Smith v. Esquire, Inc.*, 494 F.Supp. 967, 969–70 (D.Md.1980), the court holds that when a plaintiff, who is a limited public figure with regard to a defamation claim, also sues under a false light theory that has as its factual basis the same allegedly false material, that plaintiff must prove actual malice in order to recover on the "false light" claim. Since the court has held Fitzgerald to be a limited public figure as to his defamation claim, and Fitzgerald's "false light" claim is also founded upon the publication of the Chapple article, he can recover under Count II only if the defendants publicized the allegedly false material with actual malice. The court having held as a matter of law that Fitzgerald cannot prove actual malice, judgment will be entered in favor of the defendants as to Count II.

### B. Trespass

Count III of the complaint purports to state a claim for trespass to Fitzgerald's business and property rights. The alleged trespassing act was the defendants' publication of the Chapple article. This is not the sort of conduct contemplated by the common law tort of trespass. *See* W. Prosser, *The Law of Torts*, §§ 13, 14 & 15 (4th ed. 1971). Further, the plaintiff has not identified, and the court has not found, any Maryland cases recognizing a cause of action in trespass under facts similar to those alleged in Count III. Accordingly, judgment will be entered for the defendants as to Count III.

### C. Interference With Business Relationships

Count IV of the complaint alleges that by publishing the Chapple article, the defendants tortiously interfered with Fitzgerald's business relationships. The elements of this intentional tort are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and resulting loss. *See, e. g., Beane v. McMullen*, 265 Md. at 604, 291 A.2d 37; *Willner v. Silverman*, 109 Md. 341, 355, 71 A.2d 962 (1909).

The Court of Appeals noted in *Beane* that the common law recognizes qualified privileges in connection with this tort. 265 Md. at 604, 291 A.2d 37. According to Professor Prosser:

> "[T]he defendant may show that *the interference is privileged by reason of the interests furthered by his conduct*, but the burden rests upon him to do so. The question of privilege is of course as broad as the catalogue of the possible interests involved, and it must be considered in the light of the means adopted and the relations between the parties."

W. Prosser, *The Law of Torts* § 129 at 943 (4th ed. 1971) (footnotes omitted) (emphasis supplied).

In *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 597–600, 350 A.2d 688 (1976), the Court of Appeals held that even in a defamation suit by a private individual, where the standard of fault is negligence, the plaintiff's claim may be defeated if the defendant had a common law privilege to defame. Should the defendant have such a privilege, the plaintiff may recover only if he shows actual malice in the *Sullivan* sense, or "circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will," 276 Md. at 599–600, 350 A.2d 688, *quoting Stevenson v. Baltimore Baseball Club, Inc.*, 250 Md. 482, 487, 243 A.2d 533 (1968). *Accord, General Motors Corp. v. Piskor*, 277 Md. 165, 172, 352 A.2d 810 (1976).

In *Horning v. Hardy*, 36 Md.App. 419, 373 A.2d 1273, *cert. denied*, 281 Md. 739 (1977), the Court of Special Appeals held the conditional privilege, identified in *Jacron Sales*, applicable to a claim by a private individual of injurious falsehood (disparagement). 36 Md.App. at 426–30, 373 A.2d 1273.

■ The above cases involving private individuals, along with Professor Prosser's observations, suggest that the Maryland courts would recognize the *Sullivan* privilege as a complete defense if the plaintiff were a limited public figure, and the factual basis of the interference with business relationships claim was identical to that underlying the plaintiff's defamation claim. The Maryland courts have not developed this area sufficiently, however, for this court to state with assurance that such would be the case. Nevertheless, as a matter of federal constitutional law, it would be illogical to require Fitzgerald to prove actual malice in order to recover under a defamation theory, while allowing recovery for interference with business relationships on a lesser showing, when the same conduct by the defendants constitutes the basis of both claims. To do so would allow a public figure defamation plaintiff, who cannot show actual malice, to recover damages from the same defendants for identical acts simply by altering the form of his action without changing its substance. Such would be untenable under the First Amendment. Accordingly, the court holds that a person who is a limited public figure for defamation purposes may not recover on a claim of interference with business relationships, without showing actual malice, when the defendant's conduct giving rise to both claims is identical. Since it has already been determined as a matter of law that Fitzgerald cannot show actual malice in connection with the publication of the Chapple article, judgment will be entered for the defendants as to Count IV.

### D. Conspiracy

In Count V of the complaint, Fitzgerald contends that the defendants' acts in publishing the Chapple article give rise to a claim for civil conspiracy. The court disagrees.

■ It is well settled in Maryland that "a conspiracy, standing alone, is not actionable." *Van Royen v. Lacey,* 262 Md. 94, 97, 277 A.2d 13 (1971). Moreover, if the act complained of is not tortious when done by one person, then a conspiracy to do that same act is likewise not tortious. *See, e. g., Green v. Washington Suburban Sanitary Commission,* 259 Md. 206, 221, 269 A.2d 815 (1970); *Domchick v. Greenbelt Services, Inc.,* 200 Md. 36, 42, 87 A.2d 831 (1952). Since the court has determined, on constitutional grounds, that Fitzgerald cannot recover damages from the defendants for publishing the Chapple article, it follows that they cannot be held liable for that publication under a civil conspiracy theory. *See McKelvey v. Marriott Corp.,* 488 F.Supp. 345, 346 (D.Md.1980). *Cf. Carr v. Watkins,* 227 Md. at 588, 177 A.2d 841 (rule applied in connection with privacy action); *Domchick v. Greenbelt Services, Inc.,* 200 Md. at 42, 87 A.2d 831 (rule applied in connection with defamation action). Accordingly, judgment will be entered in favor of the defendants as to Count V.

For the reasons set out above, it is this 22nd day of October, 1981, by the United States District Court for the District of Maryland, ORDERED:

(1) The plaintiff's motion for partial summary judgment is DENIED.

(2) The defendants' motions for summary judgment are GRANTED.

(3) The Clerk will enter judgment in favor of the defendants, and against the plaintiff, as to all counts of the plaintiff's complaint.