**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE NEW LIFE CENTER,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.

JOSEPH FESSIO, S.J.; GUADALUPE
ASSOCIATES, d/b/a Ignatius Press;

No. 99-1658

PHILIP F. LAWLER; LESLEY PAYNE,
<u>Defendants-Appellees,</u>

and

THE CALIFORNIA PROVINCE OF THE
SOCIETY OF JESUS,
<u>Defendant.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-98-1396-A)

Argued: April 6, 2000

Decided: August 16, 2000

Before WIDENER, TRAXLER, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Ferris Ridgely Bond, BOND, CONTE & NORMAN,
P.L.L.C., Washington, D.C., for Appellant. Marion Edwyn Harrison,

LAW OFFICES OF MARION EDWYN HARRISON, Falls Church, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant New Life Center, Inc. ("New Life") is an organization that primarily provides therapy for members of the Roman Catholic religious community. Appellee Ignatius Press ("Ignatius") publishes a monthly magazine entitled The Catholic World Report ("CWR"). New Life filed a defamation action against Ignatius and various individuals associated with Ignatius and CWR as a result of a February 1997 CWR article. The district court dismissed the individual defendants for lack of personal jurisdiction and thereafter granted summary judgment in favor of Ignatius on New Life's defamation claim. New Life appeals, and we affirm.

I.

New Life is a residential treatment center located in Virginia that diagnoses and treats dysfunctional behavior in Catholic priests, seminarians, and "religious."[1] Part of New Life's approach is to ensure that priests "have adequate sexual development and a proper understanding of relationships befitting a cleric," Brief of Appellant at 5, and New Life therefore provides therapy addressing sexual disorders. When New Life evaluates candidates for the priesthood, the evaluation identifies any personality disorders, including those New Life links to inappropriate sexual development.

_____

[1] The word "religious" appears as a noun throughout the record, and, in that context, refers to members of a religious order, such as monks or nuns. See Webster's Encyclopedic Unabridged Dictionary of the English Language 1628 (1996).

2

New Life is run by Dr. Phillip Drummond, a psychologist, and Sister Carla Przybilla. Both Drummond and Przybilla regularly conduct seminars and workshops for the religious community, many of which address questions of sexuality and the clergy. Noting that "[s]exual disorders and sexual improprieties of Clergy and Religious have been given great publicity and notoriety in the past years," J.A. 277, New Life presented workshops such as "Human Sexuality, Clerical and Religious Issues in Relation to the Body, Mind and Spirit," which included discussions of "The Gay Priest, Religious [M]an, The Lesbian Sister--dealing with hetero- and homosexuality," J.A. 283, and "Maturity, Psycho-Sexual, and Sexual Identity, Psycho-Social Development," J.A. 294, which included discussions about "What to do when the Formation director becomes involved sexually with a candidate?" and "What does the public want to know about a gay priest or sister. Should he or she `come out of the closet?'" J.A. 294.

New Life publishes a quarterly newsletter that, according to Drummond, reaches nearly every bishop and religious superior in the United States. The newsletter explains that New Life's purpose is "to provide therapeutic enhancement in a therapeutic community setting to troubled and troublesome persons engaged in church ministry . . . . Th[e] treatment component is designed for . . . persons manifesting symptoms of dysfunctional behavior [and] persons suffering from addictions--chemical, sexual, food." J.A. 312.

Appellee Lesley Payne, a freelance writer from California, sold to Appellee Phillip Lawler, a Massachusetts resident, an article (the "Article") discussing three Roman Catholic treatment centers--New Life, St. Luke Institute, and Villa St. John Vianney. Lawler is CWR's freelance editor and is under contract to Ignatius to provide the content to be published in CWR eleven times a year. As was his usual practice, Lawler edited the Article and then e-mailed the Article and the other content to Appellee Father Joseph Fessio, a Jesuit priest. Fessio, a California resident, was at that point assigned by his religious order to the University of San Francisco and was permitted to serve, on a volunteer basis, as CWR's publisher. Fessio reviewed Lawler's submissions from a theological perspective and made some inquiries about the Article.

3

The Article, entitled "Salt for their Wounds," was published in
<u>CWR</u>'s February 1997 edition and was prefaced by the following edi-
tor's note:

> Much of this essay is based on reports which have been pro-
> vided by men who have--rightly or wrongly--been
> assigned to facilities set up to care for priests with emotional
> problems. Because of the sensitivity of the material, and
> because our witnesses are (again, rightly or wrongly) open
> to challenge, CWR has not printed any charges which have
> not been corroborated by at least one independent witness.

J.A. 498.

According to the Article, the treatment centers are nothing more
than "Church-run psychiatric gulag[s], usually operated by theologi-
cal liberals, often by men who are openly and actively homosexuals."
J.A. 498. Priests and seminarians who had been treated at the centers
claimed in the Article that counselors at the centers urged patients to
flout Church doctrine (particularly the Church's position on homosex-
uality) and ridiculed patients who expressed belief in or support for
Church theology and teachings. The Article suggested that New Life
and the other treatment facilities are used by the Roman Catholic
Church as a means of forcing conservative priests and seminarians out
of the ministry: "Some of these men were sent to treatment facilities
by their ecclesiastical superiors for evaluation of such `conditions' as
doctrinal `rigidity,' `compulsive' praying, and `homophobia,' and
returned with a diagnosis that they were `unfit for ministry.'" J.A.
498. Those patients who agreed with the liberal philosophy of the
counselors, however, were quickly returned to their parishes, even if
they had much more serious problems.

The portion of the Article devoted to New Life focused primarily
on Drummond's evaluation of seminary student Andrew Walter. The
Article stated that Walter received an unjustified, career-ending eval-
uation that diagnosed Walter as having a "severe sexual dysfunction,"
J.A. 498, and suggested that Walter might be a homosexual in denial.
The Article also accused the New Life Center of similarly derailing
the career of another seminarian named "Anthony," without indicating
that "Anthony" was a pseudonym. The Article suggested that homo-

4

sexual liaisons between patients were encouraged at New Life. It also indicated that Drummond was unlicensed in Virginia and insinuated that he was in violation of law.

Not surprisingly, Drummond was less than pleased with the Article's treatment of New Life. He wrote several letters of complaint to CWR, two of which were published in later editions of the magazine. New Life filed several actions in state court against Ignatius, Fessio, Lawler, Payne, and others, including this defamation action. The defendants removed the action to federal district court on the basis of diversity of citizenship.

The district court concluded that the Virginia "long-arm" statute did not authorize service of process on Fessio, Lawler, and Payne (the "individual defendants"). The district court therefore dismissed the individual defendants for lack of personal jurisdiction. As to New Life's claim against Ignatius, the court determined that New Life was a limited-purpose public figure and thus was required to show that any defamatory statements contained in the Article were made with actual malice. The district court found no evidence tending to show that Ignatius acted with actual malice, and the court therefore granted summary judgment in favor of Ignatius.

II.

New Life contends the district erred when it concluded that New Life was a limited-purpose public figure for purposes of its defamation claim. New Life also contends that even if it is considered a public figure, it presented sufficient evidence of actual malice to withstand summary judgment.

In New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964), and its progeny, the Supreme Court held that in cases involving defamation of public officials or public figures, the First Amendment requires that the defendant be held liable only if the plaintiff proves by clear and convincing evidence that the defamatory statements were made with "actual malice." See, e.g., Milkovich v. Lorain Journal Co., 497 U.S. 1, 14-15 (1990); Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1551-52 (4th Cir. 1994). If the plaintiff is not a public official or figure, then the actual malice standard does not apply when

5

determining liability, and the plaintiff "may recover such damages under any applicable state-law standard except strict liability." Foretich, 37 F.3d at 1552.

A.

Case law setting out the contours of First Amendment-driven defamation law establishes that there are three types of public figures:

> (1) "involuntary public figures," who become public figures through no purposeful action of their own; (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) "limited-purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues.

Id. at 1551-52 (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)). In this case, there is no evidence from which it could be concluded that New Life has such "pervasive fame or notoriety" that it could be considered an "all-purpose" public figure. Nor is there any evidence from which it could be concluded that New Life is an involuntary public figure. See Gertz, 418 U.S. at 345 ("Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare."); Wells v. Liddy, 186 F.3d 505, 539-40 (4th Cir. 1999) (requiring that an involuntary public figure must have "become a central figure in a significant public controversy" and must have somehow "assumed the risk of publicity"), cert. denied, 120 S. Ct. 939 (2000). The question, then, is whether New Life can properly be considered a limited-purpose public figure, which is a question of law for the court. See Wells, 186 F.3d at 531.

To determine whether a plaintiff in a defamation case is a limited-purpose public figure, we engage in a two-part inquiry. "First, was there a particular `public controversy' that gave rise to the alleged defamation? Second, was the nature and extent of the plaintiff's participation in that particular controversy sufficient to justify `public figure' status?" Foretich, 37 F.3d at 1553 (emphasis in original); see

6

also Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 688 (4th Cir. 1989) ("[A] plaintiff should not be considered a limited-purpose public figure absent the existence of a pre-defamation public controversy in which the plaintiff has become directly involved.").

(1)

When determining the existence of a public controversy, it must be remembered that not every issue of interest to the public can be considered a public controversy. See Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976). Instead, a public controversy

> must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. Essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

Foretich, 37 F.3d at 1554 (quoting Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980)) (internal alterations omitted).

As the district court noted, "[b]ehavioral disorders among the clergy had emerged as a problem long [before the publication of the Article] and had become a serious issue of public discourse in the religious community and beyond." J.A. 624. Of particular prominence were cases involving the sexual abuse of children by priests. See, e.g., Servants of the Paraclete, Inc. v. Great Am. Ins. Co., 866 F. Supp. 1560, 1563-64 (D.N.M. 1994) (involving a dispute over insurance coverage for settlements paid by a Roman Catholic treatment center to 20 plaintiffs who claimed to have been sexually abused as children by a priest being treated at the treatment center); Arthur Jones, Sexual Abuse by Priests: The Unrelenting Crisis, Nat'l Cath. Rep., Mar. 3, 1995, available in 1995 WL 12420793 ("The `sustained crisis' - the emergence of ever more victims of clergy sexual abuse - continues."); Richard N. Ostling, Sex and the Single Priest , Time, July 5, 1993, available in 1993 WL 2930465 ("After years in which the Vatican downplayed the sex scandals that have plagued the Roman Catholic

7

Church in the U.S., John Paul II publicly acknowledged the enormity of the problem."). The scandal prompted questions about the Roman Catholic Church itself, with allegations that Church officials knew about the behavior of many of the priests and simply closed their eyes to the problem, transferred the offending priests to new parishes, or otherwise covered up the problems. See Beth Wilbourn, Suffer the Children: Catholic Church Liability for the Sexual Abuse Acts of Priests, 15 Rev. Litig. 251, 252 (1996) ("The response of both the Catholic Church and the legal system to these often horrific acts of sexual abuse [by priests] has simply added insult to injury. Catholic leadership, with what has been characterized as`programmed consistency,' has reassigned priests to new parishes and tried to cover-up instances of child molestation."). Clearly, a scandal that raised questions about the fitness of priests and the integrity of the Church itself affected many more than those directly involved in any given incident, including other priests, members of the Roman Catholic faith, and the public at large. See Sex-Abuse Scandal Erodes Church's Credibility, Nat'l Cath. Rep., Mar. 24, 1995, available in 1995 WL 12421088 (describing crisis over sexual abuse by priests as "relentless, a grindstone steadily wearing away the church's credibility and the confidence of ordinary Catholics in their clergy"); Laurie Goodstein, New Mexico's Catholics Bearing Burden of Clergy Sex-Abuse Cases, Wash. Post, Dec. 30, 1994, available in 1984 WL 2000009 (noting that the Santa Fe archdiocese, at risk of bankruptcy because of more than 100 sex-abuse cases pending against it, placed valuable pieces of property for sale and entreated its parishioners to donate $1 million to a settlement fund). Thus, there can be no real dispute that the controversy over the misconduct of priests, as well as the Church's responsibility for the misconduct and its alleged cover-up, is a "public controversy" as defined by Foretich.

New Life, however, contends that the Article addressed the quality of treatment being given priests and seminarians and the qualifications of those providing the treatment. According to New Life, there was no public controversy regarding these issues until the publication of the Article. New Life therefore argues that the district court erred by characterizing it as a limited-purpose public figure. See Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979) ("To the extent the subject of [the defamation plaintiff's] published writings became a matter of controversy, it was a consequence of the [allegedly defamatory state-

ments]. Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."). We believe that New Life oversimplifies the nature and scope of the controversy.

Questions about the effectiveness of the treatment provided to offending priests was a significant aspect of the priest-misconduct controversy from the very beginning. For example, many of the lawsuits against the Church and individual priests alleged that the abuse occurred after the priest received treatment or even while the priest was receiving treatment. See Doe 1-22 v. Roman Catholic Bishop of Fall River, 509 N.W.2d 598, 599-600 (Minn. Ct. App. 1993); Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806, 809-10 (Minn. Ct. App. 1992); Wilbourn, supra, at 256-57.

In addition, Church officials and professionals treating the troubled priests publicly advocated that, in many cases, the priests' inappropriate urges could be controlled through intensive treatment and that many priests could be safely returned to the ministry. See L.M. Lothstein, Can a Sexually Addicted Priest Return to Ministry After Treatment? Psychological Issues and Possible Forensic Solutions, 34 Cath. Law. 89, 102 (1991) (stating that priests who molest adolescents rather than young children "have a good prognosis for treatment and many, if not most, can be returned to active ministry when their disorder is treated"); Priests' Abuse Treatable, Say Psychiatrists, Boston Globe, July 25, 1992, available in 1992 WL 3761585 ("[S]pecialists said many offenders could be returned to active ministry so long as the clergy and their supervisors accept lifelong restrictions and follow-up care."); see also Canice Connors, The Moment After Suffering: Lessons from the Pedophilia Scandal, Commonweal, Oct. 21, 1994, available in 1994 WL 13177940; Gustav Niebuhr, A Place of "Conversion" for Priests Who Abused Children , Wash. Post, Jan. 2, 1993, available in 1993 WL 2213770. Not surprisingly, however, such views were not universally held. See Fran Ferder & John Heagle, Clergy Pedophiles & Ministry: Another Perspective , America, Nov. 4, 1995, available in 1995 WL 12061815 ("Our own clinical experience tells us that . . . a diagnosed priest pedophile, even if he has been cooperative and relatively successful in treatment, ought not to be allowed to return to active priestly ministry in a pastoral setting."); see also Bob Secter et al., Church Takes Risk on Forgiving[;] Some

9

<u>Doubt Child-Abuser Priest Can Ever Be Cured</u>, Chicago Trib., Oct. 15, 1995, <u>available in</u> 1995 WL 6256084. Thus, it is clear that, when the Article was published, there existed a public controversy over the quality and effectiveness of treatment for troubled priests, a controversy that gave rise to the Article and to which the allegedly defamatory portions of the Article are sufficiently related.**2**

(2)

The next question that must be resolved is whether New Life is properly considered a limited-purpose public figure in connection with that controversy. To make that determination, we must examine the nature and extent of the plaintiff's involvement in the controversy, an examination that is guided by considering whether:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of spe-

_____

**2** Although we do not believe that we need narrow the public controversy inquiry any further, we note that there also existed a public controversy regarding whether the procedures of one of the centers featured in the Article were consistent with Catholic teachings, which was, of course, the more specific focus of the Article. <u>See</u> Karen Ann Ballotta, Comment, <u>Losing its Soul: How the Cipolla Case Limits the Catholic Church's Ability to Discipline Sexually Abusive Priests</u>, 43 Emory L.J. 1431 (1994). A Pittsburgh priest who was suspended by his bishop and evaluated by the St. Luke center appealed the bishop's decision to the Vatican's Supreme Tribunal of the Apostolic Signatura, the highest body to which the appeal could be taken under Catholic law. <u>See id.</u> at 1450-51. The Signatura initially ordered the priest reinstated and rejected St. Luke's evaluation of the priest, "characterizing the procedures employed at St. Luke's as contrary to Catholic teaching." <u>Id.</u> at 1454; <u>see also</u> Ann Rodgers-Melnick, <u>Vatican Overrules Bishop on Removal of Accused Priest</u>, St. Petersburg Times, Mar. 27, 1993, <u>available in</u> 1993 WL 3842403) ("The [Signatura] side[d] with [the priest's attorney] . . . who argued that the philosophy underlying St. Luke's Institute . . . was not Christian and that the facility was unfit to evaluate a priest."). The Signatura later reversed its decision and upheld the bishop's actions against the priest. <u>See</u> Ann Rodgers-Melnick, <u>Vatican Alters Rules for Disciplining Priests</u>, Pittsburgh Post-Gazette, Oct. 13, 1995, <u>available in</u> 1995 WL 9538120.

cial prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation.

Wells, 186 F.3d at 534; see also Foretich, 37 F.3d at 1556; Reuber v. Food Chemical News, Inc., 925 F.2d 703, 708-10 (4th Cir. 1991) (en banc).

As to the first factor, we conclude that New Life had access to effective channels of communication. New Life conducts numerous seminars each year that provide frequent opportunities to refute the charges made in the Article. Moreover, New Life publishes an internationally-distributed quarterly newsletter described by Drummond as "highly respected and sought-after," which has "many thousands of readers including, but not limited to, every bishop and religious superior in the United States and many foreign countries." J.A. 601. In addition, Drummond, New Life's president, owns the Plains Group, a publishing company. The Plains Group has published books by Drummond and Przybilla, both of which were apparently well received within the Catholic religious community. New Life's access to these effective channels of communication make it more able than a private individual to refute the defamatory charges, and thus weighs in favor of the conclusion that New Life is a limited-purpose public figure.[3]

The second and third factors--whether the plaintiff voluntarily assumed a role of prominence in the controversy and sought to influence the resolution of the controversy--likewise indicate that New Life is properly considered a limited-purpose public figure. Through

_____

[3] We find meritless New Life's argument that these channels of communication are not effective because it cannot reveal confidential patient information in the course of defending itself against defamatory charges. To accept this argument would effectively prevent professionals such as doctors and lawyers, who owe duties of confidentiality to their clients, from ever being considered limited-purpose public figures. Moreover, New Life can certainly defend its practices and the qualifications of its staff without revealing confidential information.

11

its well-distributed newsletter and its many seminars, New Life presented itself as an expert on evaluating and treating various psychological problems and behavioral disorders suffered by priests, with much of its emphasis on sexual problems. In a 1996 letter directed to diocesan and other religious leaders, New Life trumpeted its services for "troubled or troublesome persons engaged in church ministry," J.A. 335, and explained that it offered counseling and treatment for those suffering from, among other things, "sexuality and celibacy conflicts" and sexual addictions. J.A. 336. New Life claimed its treatment was highly effective, noting that "[o]f the hundreds who have gone through the center, . . . not one has had to return to therapy, and no one is on psychotropic medication, and all of them are in full-time ministry in Church or Church-related works." J.A. 338. New Life's advertisements also describe Drummond as a "[n]ationally and internationally known researcher, lecturer and diagnostician," and Przybilla as "[n]ationally and internationally known for her work in formation." J.A. 294.

This evidence belies New Life's contention that it was a mere educator that never sought to influence any controversy. Instead, the evidence convincingly establishes that New Life voluntarily thrust itself into the controversy regarding the treatment of priests with psychological or sexual disorders and that New Life sought to influence the resolution of the controversy by promoting what it believed to be its highly successful methods of treatment. While New Life may not be well known to the public generally, it is by its own admission well known and well respected within the hierarchy of the Roman Catholic Church. Cf. Reuber, 925 F.2d at 709 ("Someone who has not attracted general notoriety may nonetheless be a public figure in the context of a particular controversy covered by publications of specialized interest."). Accordingly, these factors also indicate that New Life is a limited-purpose public figure with regard to the subject matter of the Article.

The fourth and fifth factors--whether the public controversy existed at the time of the alleged defamation and whether the plaintiff retained its status as a public figure at the time of the defamation--are easily resolved. As previously discussed, the public controversy regarding the behavioral problems of priests and the treatment for those problems existed at the time of the publication of the Article.

12

And the evidence in the record clearly establishes that New Life retained its status as a public figure at the time the Article was published, given that New Life continued promoting itself and its services through its seminars, advertisements, and newsletters.

In sum, an evaluation of all the relevant factors indicate that the nature and extent of New Life's involvement in the controversy surrounding the sexual misconduct of priests and the proper treatment for priests with sexual disorders is sufficient to warrant treating New Life as a limited-purpose public figure in connection with that controversy. See Reuber, 925 F.2d at 709 (finding scientist to be a limited-purpose public figure and noting, among other things, that the scientist "described himself as `eminent' in his field"); National Found. for Cancer Research v. Council of Better Bus. Bureaus, 705 F.2d 98, 102 (4th Cir. 1983) (finding plaintiff to be a public figure because the plaintiff "attempted, through various means at its disposal, to put itself and its methods before the public"); Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 272-74 (3d Cir. 1980) (finding that plaintiff who launched an extensive campaign advertising its product was a limited-purpose public figure). We therefore affirm the district court's conclusion that New Life is a limited-purpose public figure.

B.

As a limited-purpose public figure, New Life can recover on its defamation claim only if it establishes, through clear and convincing evidence, that Ignatius acted with actual malice when making the allegedly defamatory statements. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986) ("[W]here the factual dispute concerns actual malice, clearly a material issue in a New York Times case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."). We agree with the district court that New Life failed to create a genuine issue of fact as to the existence of actual malice.

A defamatory statement is made with actual malice if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times , 376 U.S. at 279-80.

13

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). The plaintiff's burden in establishing actual malice is substantial, requiring a showing of "conduct . . . so reckless. . . that it approaches the level of publishing a knowing, calculated falsehood." Ryan v. Brooks, 634 F.2d 726, 733 (4th Cir. 1980).

New Life first contends that the disclaimer at the beginning of the Article shows that Ignatius had doubts about the accuracy of some of the sources for the Article, thus establishing actual malice. We disagree.

The disclaimer recognizes that, particularly when a controversial subject is involved, many readers will question the reliability of sources with a personal interest in the story; it in no way establishes that Ignatius entertained serious doubts about the veracity of the sources. If anything, the disclaimer indicates that Ignatius only published allegations about which it did not have any serious doubts. New Life simply presented no evidence from which it could be concluded that Ignatius or the individual defendants doubted or had any reason to doubt the reliability of their sources. Cf. St. Amant, 390 U.S. at 732 (noting that actual malice may be shown "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports"); Wells, 186 F.3d at 543 (finding evidence of actual malice sufficient to overcome summary judgment motion where the defendant acknowledged that his source had a history of mental illness and had "`difficultly differentiating between reality and non-reality'"). Accordingly, we reject New Life's suggestion that the Article's disclaimer can be considered evidence of actual malice.

To the extent New Life contends that actual malice can be inferred from the failure of Fessio, Lawler, and Payne to adequately investigate before publishing the Article, that argument also fails. The evidence establishes that Payne researched the Article to her satisfaction and in a manner that she believed was consistent with her responsibilities as a journalist. At Fessio's request, Lawler confirmed with Payne that there was an independent source for every charge made in the

14

Article. While Payne may not have asked every question that New Life thinks she should have, and while New Life may complain about how Ignatius confirmed the allegations,**4** New Life's displeasure over the manner in which the story was investigated simply cannot be equated with evidence of actual malice. Because there is no evidence in the record from which it can be inferred that Ignatius or the individual defendants purposefully closed their eyes to the truth or entertained serious doubts about the truth of the Article, New Life's complaints about the nature of the investigation for the Article are insufficient to withstand the motion for summary judgment. See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." (citation omitted)); Ryan, 634 F.2d at 734 ("As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error.").

New Life further contends that actual malice can be inferred from an incorrect statement contained in the Article. The Article stated that Drummond diagnosed Andrew Walter with "severe sexual dysfunction." J.A. 498. Drummond's report, however, which Payne had when she wrote the Article, diagnosed Walter as suffering from a "Psychosexual Disorder Not Otherwise Specified." J.A. 773. New Life argues that the knowing publication of a false diagnosis demonstrates that the Article was published with actual malice.

_____

**4** New Life claims that the allegations were not truly verified by independent sources because the "independent sources" merely repeated what they had previously been told by the sources relied upon in the Article. New Life's view that such a procedure is not a proper way to verify the allegations does not give rise to an inference of actual malice. See Church of Scientology Int'l v. Daniels, 992 F.2d 1329, 1334 (4th Cir. 1993) ("[A]ctual malice cannot be established merely by showing a departure from accepted journalistic or professional practices."); cf. St. Amant, 390 U.S. at 730 (concluding that actual malice cannot be established by merely showing that the publisher relied on the unverified statement of a third party).

15

The evidence in the record establishes that Fessio, in the course of his review of the Article, sought input from a priest-psychologist unconnected to the magazine. The priest reviewed the Article and suggested changing the reference to the diagnosis to "severe sexual dysfunction" to make the diagnosis sound less harsh. There is no evidence suggesting that Fessio or Lawler believed the change was medically significant or that the altered diagnosis would reflect more negatively on New Life and Drummond than would the actual diagnosis. Under these circumstances, the relatively minor (at least to a layman) change in the diagnosis cannot give rise to an inference of actual malice. See St. Amant, 390 U.S. at 731-32 (discussing the importance of the defendant's good faith when determining whether a statement was made with actual malice).

Finally, New Life argues that the "knowing failure" to identify in the Article that a pseudonym was used for one of its sources is evidence of actual malice. Given the complete absence of any evidence tending to show that the defendants had any reason to doubt the reliability or veracity of the source, we do not see how the failure to identify the use of a pseudonym can be considered evidence of actual malice. See Church of Scientology, 992 F.2d at 1334 ("[A]ctual malice cannot be established merely by showing a departure from accepted journalistic or professional practices.").[5]

Accordingly, we agree with the district court that New Life failed to present evidence tending to show that the Article was published with actual malice. We therefore affirm the grant of summary judgment in favor of Ignatius on New Life's defamation claim.

_____

[5] In its summary of the arguments, New Life listed as additional evidence of actual malice the failure "to retract an insinuation that New Life was operating illegally without licensure." Brief of Appellant at 18. New Life, however, did not develop this argument in the body of its brief nor raise the issue at oral argument. The issue, therefore, has been abandoned. See 11126 Baltimore Blvd., Inc. v. Prince George's County, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (en banc). New Life also listed in its notice of appeal a challenge to the district court's order denying New Life's motion to alter or amend the grant of summary judgment, but New Life's brief includes no argument addressed to that order. New Life thus has abandoned that issue as well.

III.

The district court concluded that it lacked personal jurisdiction over the individual defendants because they could not be reached under Virginia's long-arm statute. New Life challenges the dismissal of the individual defendants in its brief.

To prevail on its claims against the individual defendants, New Life would be required to present evidence establishing actual malice on the part of the individual defendants. New Life conceded at oral argument that if this Court found its evidence of actual malice on the part of Ignatius to be insufficient, then it could not establish actual malice on the part of the individual defendants, thus rendering moot the dismissal of the individual defendants. Because we have rejected New Life's evidence of actual malice, the personal jurisdiction question is therefore moot.

IV.

For the foregoing reasons, the decision of the district court is hereby affirmed.

AFFIRMED

17